May it please the Court, I am Monica Miller, Cuneo, Gilbert & Laduca, Washington, D.C. for Plaintiffs' Appellants. This is an action brought under the False Claims Act. It concerns the sale of durable medical equipment, specifically a device called a CPAP machine and related peripherals. CPAP is a device that is somewhat less intrusive than a ventilator and assists patients with respiratory difficulties, assisting them with their breathing by providing gentle air pressure. You walk me through practically the complaint is long and has significant attachments to it. So can you walk me through how, in your view, the alleged upcoding worked with regards to the batteries? Okay. Your Honor, you're referring to one of the four substantive allegations in the case? Yes, yes. The upcoding of batteries. I'm not asking you about the entire complaint, so it's focused on that theory. Absolutely. Our allegation is that Optogen was billing for ventilator batteries and using a HCPCS code applicable to ventilator batteries but was providing CPAP batteries. We allege that Optogen has never sold ventilators or ventilator batteries. Can I ask you just a question before you finish answering? This is the improper code count? Correct. The upcoding count. Thank you. And upcoding, as I suspect the Court is familiar, is the practice of billing for something more expensive than what was actually provided. And to be clear, we do not allege lack of medical necessity, so they billed for one thing and provided another. Okay. Now, so the essence of that theory and that count is that they billed for ventilator batteries but actually provided CPAP batteries, right? Correct. Okay. Are CPAP batteries reimbursable? They are reimbursable for patients for whom they are medically necessary. But I think the answer is generally yes, if there is medical necessity. Okay. As the Court is well aware, claims under the False Claims Act are subject to the heightened pleading requirements of Rule 9b. And this Court has issued many opinions describing how one meets those standards in a False Claims Act case. And there are two alternative means of meeting that pleading standard. And the key here is alternative, and I'll get to why that's so important. One is to provide some type of billing data. And in the Atkins case, for example, this Court said you could meet the burden by providing certain information as to specific claims for payment, such as the amounts of charges, actual dates, billing practices, or policies. That's this Court in Atkins. In the Mastedge case, they say exact billing data, name, date, amount, and service is rendered, in quotes. But the Court explained that there are no specific data fields that can be provided, just certain of these types of data fields. An alternative means of satisfying Rule 9b in a False Claims Act case is to show indicia of reliability that a false claim was actually submitted. This standard is met when the relator has direct, firsthand knowledge concerning the  And this type of knowledge can arise from the fact that the plaintiff or the relator was involved in billing, or spoke to somebody involved in billing, or supervised people involved in billing. We gave examples of the Walker case, in which the relator was a nurse, not a billing person, but who spoke to billing people. And in Mastedge, the relator was a senior officer who had supervisory responsibilities and access to billing information. I understand your theory and allegations about the claims related to the copay waivers and the shipment of unordered supplies. Are the kickback allegations related in any way to the upcoding, or is it separate? They are related in some ways, but they are separate wrongs. While you're doing that, I'd like to know how that works, how the kickback thing works, as if you were doing it in this courtroom. Well, there are four types of claims in our case. You have a physician who has a patient, and at the starting point, the patient is sent for testing to Mayo Clinic or somebody. There are four substantive allegations in this case, and two of them could be characterized as kickback claims. Well, let's take a physician sends me to Mayo Clinic for testing. Okay. Medicare will pay for that. Mayo Clinic is going to charge me for the testing. Isn't that right? Correct. And they'll take my claim against Medicare. So that happens there.  Now, Mayo Clinic tells me I have to find a vendor for the CPAC. Isn't that what happens next? Well, I'm not sure your hypothetical is on all fours. Well, let's get the testing. The doctor to the patient is tested, and the testing company makes money from Medicare, builds Medicare, and now we've got to get a machine. Now, what is the complaint alleging about how that happens? Okay. What we are alleging is that people we refer to as contract field technicians who are typically employed by prescribers. All right. Who at the clinic is this person? This person could be a nurse, could be a PA. It's somebody who works for a prescriber. PA does the testing. PA gets paid a fee by Optogen. They get paid money. And I need a CPAC machine. That's right. Our allegation is the CFTs are paid fees in part to induce referrals. The CFTs are paid because they are paid over market rates? Well, our allegation is they don't have to be paid over market rates, but we do allege they were paid over market rates in some detail, but it wouldn't matter if they were. We're going ahead of the game. Okay. Somebody recommends the supplier of the CPAC machine. Either the patient finds it or looks on eBay or wherever and finds out where can I get a machine. The patient may be aware of it. The physician may be aware of it. Somebody else in the physician's staff may be aware of it. Mayo Clinic gives me a list. I'm the patient. Okay. What we've alleged in this case is that Optogen was paying fees to these technicians in part to induce referrals. And under controlling law in the circuit, that's illegal. Wait a second. The guy who's doing the test, ultimately I'm going to get a CPAC machine and somebody's going to tell me how to install it. Is this the guy getting the kickback? The CFTs, the contract field technicians who are generally employed by prescribers, were getting paid fees by Optogen that we allege were designed to induce referrals. And to the extent it matters, and we don't think it matters, they were above market rates for what a respiratory technician would get paid. They're customarily respiratory technicians. Let's break this down because you really need to think about helping us factually understand. You know this case from your perspective inside and out. And you know the intimate details of the industry and how you think it works. We do not. So you have to go from up here in terms of theory and law to like here in terms of practice and how it works. These CFTs, what do they normally do? What is their job at a given entity? What is their job? What do they do? They could be typically the respiratory therapist. They're typically respiratory therapists who work at sleep clinics. What are they paid to do? In your world, as you see it, what are CFTs normally paid to do? And by whom? They're normally paid to provide respiratory therapy and help people with breathing difficulties. And who pays them? They would be typically paid by an insurer ultimately. I mean initially they're paid by a doctor's office most likely. And then the doctor's office is paid by an insurer.  And how in your, as you see things, how do the defendants, Lincare and Optogen, come into that flow of payment? They have a separate stream where they send cold hard cash to the CFTs on the side. For what purpose in your view? In our view, to induce them to make referrals. Some of them got as much as $250 for a 15-minute setup. The ones who are most prolific. But Lincare is not paying them solely to get a referral, right? They're paying them in part for a service. Is that not right? Ostensibly, yes. No, not ostensibly. You just said that they provided 15 minutes worth of work. They set up the machine. Which takes how long? We allege 15 minutes. Do they get paid for those 15 minutes? They're on the clock as respiratory therapists, yes. Oh my God. Do they get paid for those 15 minutes? Are they being paid otherwise? I do not know, to be honest with you. Aren't they charging the patient for that money, for that time? No, the patient is not paying the setup fee. Who's paying it? The patient is paying everything. Who pays the setup fee? The claims made to Medicare. The setup fee is paid by Optogen to the CFT. So there is, I'm just trying to understand. I'm not fighting you, but you're fighting us in terms of just understanding. We haven't even gotten to your legal arguments. We're trying to understand what this long, complex complaint says. So think about that in trying to answer the questions and help us out. If we don't understand your theories, you're going to have a hard time convincing us to reverse. Yes, Your Honor. Okay. The CFT provides some service. You've described it as a setup fee, right? Correct. Okay. Put a number on that setup fee in terms of dollars. Let's say it's $15. And that's what CFTs get paid to set up a machine. For 15 minutes worth of work, they get $15. If Optogen and Lencare pay them for that setup, is that not right? They pay them at least $50, and they pay them for that setup, yes. You're not helping. The answer is yes. Okay. So there is a legitimate payment going from Lencare and or Optogen to the CFT for setup of the machine. Is that right? It's illegal if it's done in part to do induced referrals. But there is a payment. Who's obligated to make the payment? My understanding is all of this is paid for by the patient, except that the patient assigns the Medicare collection to the supplier. The setup fee is not billed to— The tester who tested me for the breathing is going to charge me something, and Medicare will pay for it, right? The patient is billed for a CPAP machine and accessories. The patient is not billed for a setup fee. The patient goes to Mayo Clinic to be tested. Doesn't the patient owe the money? If the patient were uninsured in theory, yes. The patient would be charged for a CPAP machine. They would not be charged for a setup fee. The patient has insurance in the form of Medicare, let's say. If he goes to Mayo Clinic, he owes Mayo Clinic for the testing, right? Mayo Clinic—the patient would be billed for the CPAP machine and accessories. All right. Not for the setup fee. No. We haven't got a CPAP machine yet. Okay. Somebody's got to arrange for the patient to get a CPAP machine. That's right. Somebody has to prescribe it. And Medicare is going to pay for that, for the machine that the patient gets. Correct. Okay. I've reserved six minutes, so— No, no, no. It's okay. You may go way beyond your normal time, of course. Okay. All right. Let me ask you a question about the upcoding. Let's talk about the complaint. My understanding is in the complaint, you specifically provide at least 33 exemplars, including claim numbers, amounts paid, billing codes, data submissions, date of payments, check numbers, check dates, patient ID numbers, patient residences, identity of claimant, identity of the claimee. And this is all part of the complaint that you allege for parts of the upcoding.  And under our decision at Ohlhausen, this court's decision, we specifically say that you can prove— really, you have to show the who, what, where, when, and how of the fraudulent submissions. Correct. So for the upcoding, you have that information. Do you have that information for the other counts? We have it for two of the four claims. What is the other claim that you have it for? We have alleged that we also have billing data for one of the two kickback claims, and that is the set-up fees, the CFT set-up fees. We do not have a paper trail of the set-up fees themselves, but we allege that a set-up fee was paid every time Optogen billed for CPAP and accessories. Every single time. So we do have the bills that were sent, the billing data between the federal government and Optogen. Who does Optogen or Lincare contract with the CFTs to install the CPAP machine and set it up? If not, how does the CFT get involved? Optogen keeps a roster of CFTs, and exactly how many set-ups they've done, their name, address, phone, telephone number. Optogen has to install a CPAP machine for a given patient in Jacksonville. Okay. How is there a CFT in Jacksonville that gets to install that CPAP machine? Optogen calls them, has a roster, and says, okay, you're the nearest person, so you go out on Tuesday to X's house, and you set up that CPAP machine. More likely it's the other way around, that the employer of the CFT calls Optogen and asks for a CPAP machine, but it could happen that way as well, Your Honor. Okay. This is what I'm trying to understand, and I hope you can help. Absolutely. If there is a legitimate set-up fee, no matter how minuscule, your kickback allegation has to be that in order to get referrals, they are paying more than the fair market value of that set-up. Isn't that a reality? That's actually not the lawyer, with all due respect, Your Honor. Okay. If the set-up, this is what I don't understand, and this is what I'm hoping you can help with. If there is a legitimate cost and charge for set-up, how does paying for a legitimate service only at market rates constitute a kickback? Well, we've cited cases, Your Honor, that hold that even when market... I don't want to hear about cases. You want to hear about law? No. I want you to explain to me how a kickback is a payment made to someone for something that they haven't done so that they can illegally refer usually a patient or a service to you and you get the business. Is that generally your understanding? Partially correct. It's partially incorrect, Your Honor. Okay. If the United States as a whole had determined through market forces that the set-up fee for a CPAP machine was $15 and Lincare and Optogen paid only $15, would you still have a kickback claim? Absolutely. Why? Because a kickback is illegal if it is paid in part to refer patients, and it doesn't matter, and there are an ample number of cases. We cite them in our brief that say it doesn't matter if it's fair market value. We also pleaded that the payments here were far in excess of fair market value anyway, even if we have to make that showing, and we don't. Okay. I understand you're trying to make the legal showing, but we're interested in the facts. I've done both. We've pleaded. I understand that, but it's really we're just asking questions, and you're making it very difficult. Okay? The question is you keep talking about that they were paying more than fair market value. Where do you allege that in the complaint? What we allege in the complaint? I mean, I can give you the exact page references if you want me to. While you're doing that, you can answer how the setup man who set that thing up for a fee is able to send customers to the defendant. They get on the phone and they call Optogen, and they say I've got a patient here who needs a CPAP machine. No, no, no, no, no. The setup man doesn't have a patient until bail clinic has said you need a CPAP machine, and the supplier of the machine is going to provide the machine, and supposedly the sub-technician is going to install it, right? Correct. All right. Now, I'm the defendant. How do I expect you, you're the installer, to send me business? How are you sending me business? You're not Mayo Clinic. You're not the doctor. The doctor can send business to Optogen, and the doctor's staff can be the person who actually makes the contact. It could be the CFT. The CFT works for a doctor, works for a prescriber. Oh, he's going to help the doctor. They're going to help somebody else send patients. Is that right? It would hardly be unusual for somebody working for a doctor to influence prescribing conditions. We got to guess at it, don't we? Somebody being paid more for a setup than the fair market value. Wait a minute, wait a minute. Works for somebody who's going to send, so I'm the setup guy. I'm going to get a doctor to send patients to the defendant. Is that right? Correct, and we've pleaded that these CFTs do have that ability to do that, and that's why they're paid that much money. That sort of defies common sense. That's what actually happened. What happened is defined by our complaint, not by common sense. And paragraph 78 to 79 of the complaint, at 831 in the record, we describe that the fees are more than fair market value. Respiratory therapists have never made $50 an hour anywhere, and that $50 an hour is the minimum fee that they were paid for a setup that takes less than an hour. Sometimes they were paid as much as $250. The fees varied widely depending on how prolific a referral source they were. Okay, Ms. Miller, we've taken you way beyond your time, but you've saved your six minutes for rebuttal. Mr. Berman. Yes, Your Honor. Can you help me? I can, but I've got to be honest. I have to go outside the record to answer many of your questions. I'm the patient at Mayo Clinic. A doctor sent me there for a test. Mayo Clinic says you need a CPAC machine. Correct. All right. Now what happens next according to the plaintiffs? Well, to answer that, Your Honor, I'll have to go outside the complaint. But what typically happens is the physician would then contact a DME provider like Optogen and says Judge Joe Flatt needs a CPAC machine because he has sleep apnea. Yes, so Mayo Clinic will contact the supplier. The physician will, yes. You need a physician to order the CPAC machine to get it covered. And Medicare will pay Mayo Clinic for the testing? I believe so, Your Honor. And will pay the supplier for the machine?  And then what happens? Oh, sorry. Go ahead. Once Optogen receives the order from the physician and the authorization from Medicare TriCare, they contact one of the CPT technicians, the installer as you refer to them, who they have a list of them, and they have that installer take the CPAC machine out. Typically it's to the patient's home. Sometimes the patient's in, like, a nursing home or wherever the setup's going to be. And so it's a little more than a 15-minute process because the installer has to drive, get out there, set it up, explain it to the patient, and then drive home. So it's not a 15-minute process, and they're paid for that service. By the supplier? Yes, Optogen pays the installer. And the supplier will get that money from Medicare for the machine? Correct. And would that include the installation? I don't believe the installation is broken out separately, Your Honor. All right. Then it's within it. Correct. And the fair market value of the machine includes that? I believe so, Your Honor. So where is the kickback? Well, Your Honor, as we pointed out. According, as you understand, I think what he's asking you is, according to the complaint, where is the kickback? We don't think they've alleged the kickback with Rule 9 specificity. No, I know, but the question is, generally speaking, where does the alleged kickback arise from? What is it created by? I know you don't think it's enough for a lot of reasons, but. . . It would come from that they're essentially overpaying the installer. So there's no allegation of this, but if they paid the installer $10,000 to drive out to Judge Joe Flatt's house, even if it took three hours, that would be . . . They'll take a loss then, won't they? Sometimes, yes. Get that from Medicare. And I think it's important also to keep in mind that Optogen has already received the order for the patient by the time they contact the CFT. The CFT does not refer that patient. They already have the patient, for lack of a better term. Mr. Berman, here. I have difficulty understanding some of the plaintiff's theories. The one I don't have a problem understanding is the upcoding.  And it seems to me that whether or not that claim is valid at the end of the day, I can easily understand how they've pled it. They've got all sorts of billing data. They have allegations in the complaint about what that billing data shows. They have it for a number of plaintiffs. They say what the upcoding is supposedly about, you know, the provision of CPAP batteries, but the charging for ventilator batteries. What's missing for Rule 9 purposes? What's missing on the upcoding claims? I think, Your Honor, the biggest thing missing is that under their own allegations, Medicare or TRICARE would not pay Optogen for ventilator batteries. As my friend explained a starter argument, sleep apnea, which all of the exemplar patients were diagnosed with, is appropriately treated with a CPAP machine, not with a ventilator. So, in other words, if Optogen actually billed for ventilator equipment, Medicare or TRICARE or whoever is paying it is simply going to say, this patient doesn't need ventilator equipment. We are not going to reimburse you for it. Any more than if Optogen tried to bill for a wheelchair for a CPAP patient. Doesn't the complaint allege that there was such billing and there was such payment for ventilator batteries? But the complaint also alleges that TRICARE and Medicare would not pay that. If they knew, if they knew. But they do know, Your Honor, because the complaint alleges that all these claims are filed with a Form 1500, correct? Now, a Form 1500 has about, I think it's 33 separate boxes of information contained in it. There's insurance information, there's information about the patient. But the two boxes I want to talk about are Box 21, which is a box that lists the diagnosis code. All of the example patients in the Fourth Amendment complaint suffer from sleep apnea. And then the other box that's relevant is the box with the billing information, Billing 24. So, when TRICARE got these claims, it knew two things, or Medicare or whoever got them. It knew that the patient was diagnosed with sleep apnea. And if you believe the relator's complaint, that Optogen was trying to bill for ventilator batteries. But those are contradictory. They conflict because... But the government doesn't always figure things out. And the government sometimes pays things inappropriately. And sometimes they do it because of a purported false claim. So, you submit a false claim to the government, and somebody's not paying attention, and they pay what they're not supposed to pay. That doesn't mean that the claim isn't false under the False Claims Act. Well, Your Honor, I would argue that it undercuts two elements of the False Claims Act. One, materiality, because as the Supreme Court told us in Escobar, materiality, you look to... What is the person receiving the false claim likely going to do in response? In other words, was TRICARE or Medicare going to be induced to pay more money if they got a ventilator claim? And I posit that it's exactly the opposite, because they knew that these were sleep apnea patients. Their policy, according to the relators, is that they don't pay for ventilator equipment for sleep apnea patients. So actually, what should have happened is that Optogen should have got no money, not more money for these claims. And also, I... Can they bill for any batteries for CPAP equipment? Correct, yes. I think relators acknowledge that. What can they bill for? On the battery side, what can... In an amount? No, not amounts. Category. Can they bill for batteries for the CPAP machine? They can if it's authorized by a physician, yes. Okay, under what code? What is that code called? CPAP battery? It is unclear. The problem is there's not a specific code for CPAP battery. There's just not. Now, relators allege that they can't use the ventilator codes, but there's no guidance. There's no policy that says that. Is it your argument that the claim would not have been paid because Medicare knows or Tricare is a CPAP patient?  And they're billing for ventilator stuff? Correct. They would know that? They would, and if you look at... So they willingly paid a false claim is what you're saying? I'm saying the other option is they appropriately paid the amount for CPAP batteries. Let's take the possibilities. One is the guy who sees the code, sees it's a CPAP patient, and realizes that that's too much money. It's ventilator money. That's the code. Isn't that one possibility out that they allege here? Well, they also fail to allege that... No, no. Do they allege that? It's unclear, Your Honor. Well, it is true that Tricare and Medicare paid too much money for CPAP battery. No, that's... Well, let's put it this way. Should not have paid for ventilator battery. They also haven't alleged... No, no. Is that part of what they're alleging? Yes, but they only generally allege it. They haven't alleged with specificity that ventilator batteries actually are reimbursed at a higher rate than CPAP batteries. All right. They don't have any specific examples. They allege in their complaint... In other words, they haven't alleged a loss, in effect. Correct. In fact, it's entirely plausible that the reimbursement rate is the same. Remember, these are not the machines that are being installed. They're just batteries. So maybe a battery for a CPAP machine costs the same as a battery... Or a mask and whatnot. Correct. Yeah. Well, masks are different because there are separate codes. But at issue are the batteries or the battery cables. And maybe they're the same price. And so it's not material whether it's billed as a ventilator or CPAP. If the complaint doesn't identify and you say that there isn't a code for CPAP batteries... Correct. How are you supposed to bill for CPAP batteries? Well, one, we allege that that's the relators. They have failed to allege that. Two, if you look at Exhibit G and H, it shows that TRICARE at least knew, if not instructed, that it was appropriate to use these ventilator codes to bill for CPAP batteries and equipment. They allege that? Exhibit alleges that. They don't allege it. But if you look at the exhibit to the complaint... You infer that from the complaint and the exhibits? The exhibits are pretty clear. That TRICARE said use this? Correct, Your Honor. Okay. Or CPAP stuff? Correct. Because if you look at Exhibit G and H, there's multiple items on there and it's a mixed bag. It's a CPAP machine, but it's billed as ventilator batteries and equipment. All right. Let's talk about the kickback claims. Tell me why you think those claims fail. Either under Rule 9 or something else. Correct. This Court has held that kickback claims must be pled with the specificity required by 9B, and they just don't allege it. If you look at the allegations, they're cut-and-paste, conclusory allegations that I don't even think satisfy Rule 8, let alone 9B. There's no name of anybody who received a kickback. There's no indication how they were in a position to refer an existing patient or a new patient to Optogen. What they're alleging is they overpaid the technician because somehow or another the technician exercised somebody's power to send a request in for a machine. They allege that generally, but they don't provide specific examples other than they say some technicians were overpaid, but there's not a single example that led to a claim where they say Installer X was overpaid by $200. Or that Installer X had the power to order a machine. Correct, to influence a referral. Correct. Which is the heart of a kickback. Yeah. You don't think they've satisfied any aspect of Rule 9 on the kickback claims, or you think they failed on some of the Rule 9 requirements? I don't think they've satisfied any of them, Your Honor. They're all conclusory allegations. I mean, they say that Lincare and or Optogen paid a minimum of I think it was $50, right? Correct. They say that. You think that's conclusory? I do. Because? Because it doesn't establish that whether you want to use the term fair market value or more than fair. No, no, no. I'm not saying that saves the claim, but that in and of itself is not a conclusory factual allegation. Lincare slash Optogen paid CFTs a minimum of $50 for setup fees. That's not conclusory. No, but it also doesn't establish a kickback. I'm not saying it saves the claim, but I think you are arguing, in my personal opinion, too broadly on some of these claims because not every factual allegation in each claim is conclusory. The claim as a whole may not have enough to survive Rule 9, but you can't say that every single factual allegation is conclusory. Saying that Lincare and Optogen paid a minimum of $50 for setup fees to these CFTs, that's not conclusory. That's pretty specific. It is, Your Honor, and I don't remember off the top of my head whether it's a minimum, but the concern with the $50 is they don't tie that to any actual specific payment to a specific CFT that then led to a claim. That's just a general – That might be a Rule 9 problem, but I'm not sure that the entirety of the kickback allegations are conclusory as a general matter. I just don't think they've come close to satisfying or alleging enough claims to satisfy 9B. Okay. Okay, Mr. Berman, thank you very much. Thank you, Your Honor. Okay, Ms. Miller, on the upcoding, one of the arguments that the defendants make is that you have not alleged that there is a reimbursement difference between CPAP batteries and ventilator batteries, and they suggest that that is fatal to your False Claims Act claim. Can you please respond to that? Yes, Your Honor. Defense counsel is incorrect, and I refer the court to paragraph 52 of the Operative Fourth Amendment complaint at page 825 in the record. We describe the exact price difference. In fact, when I wrote the complaint, I went online and researched the price difference. I wrote the complaint, and it's in there in paragraph 52. What are the differences? We have alleged, we gave an exemplar of the total cost for a battery pack and battery cables and charger being billed at $388, and we allege that for a CPAP device, the market price would be between $229 and $269. That's the allegation in paragraph 52. Okay. And we also indicated that sometimes the charge billed by Optogen was more than $388, and that's reflected in the 33 exemplars. Another inaccuracy is that defense counsel just said we didn't identify any of these CFTs. That's actually not true at all. In paragraph 76 of the complaint, we name three of the more prolific CFTs, and we expressly plead that as of 2020, a CFT named Lucy Beyo in Hawaii, I hope I'm pronouncing her name right, was still being paid $125 per setup and had been paid more previously, and we identified two other CFTs, Mike Hall and Oswald Saliz in the San Diego area, who were being paid $75 per setup at the time. How did Plaintiff Alvarez know this? He's the guy who supervised all the CFTs between 2015 and 2020. He was a CFT between 2006 and 2015. Nobody on this planet knows more about this arrangement than Randy Alvarez. One of the other things that Mr. Berman argued is that you have not alleged how it is that these CFTs who are hired by providers like Optogen and LendCare are influencing the referral of patients. Do we have details about the intra-office politics at these clinics? No, no, no. How do you think that LendCare and Optogen hire the CFTs, right? Well, the CFTs are not employees of LendCare and Optogen, but they are paid setups. Independent contractors? Yes. Okay. So if LendCare and Optogen are hiring, paying these CFTs to go ahead and pick up and install the CPAP machines, for patients for whom LendCare and Optogen have already obtained a prescription, how does the payment to the CFT get LendCare and Optogen to receive more patients? We have alleged in our complaint that the CFTs have the ability to influence which CPAP vendor the prescriber calls. We don't allege the CFTs decide to prescribe CPAP. We allege they can influence which vendor is contacted, just like a nurse in an office might influence which person you buy bandages from. So the CFTs are calling whom to do this influencing? We do not describe the precise mechanics through which the CFTs come to influence the choice of vendor. We just say that they do influence the choice of vendor. I'm not asking for a roadmap, but who are they influencing? In Judge Choflat's example, they're influencing the doctor at the Mayo Clinic? They are not influencing the doctor to prescribe CPAP, but they are affecting the decision as to which vendor is contacted to provide a CPAP machine. Right. So the CFT is somehow, someway interacting with the medical people at the front end, the doctor and or the hospital that is prescribing the CPAP machine, so that that medical provider chooses LendCare or Optogen as the DME provider. That's the theory? Doctors do not necessarily choose the CPAP provider. They choose to prescribe CPAP, absolutely. And who chooses the provider? That can vary at any protectionist's office. What have you alleged? We've alleged that the CFTs have the ability to influence the decision of which provider. Who makes the decision as you've alleged it? We've alleged that CFTs have the ability to influence that decision. But that's... Do we need to allege more than that? No. I'm not suggesting anything. I'm trying to get answers. It's hard for you to allege with Rule 9 pleading requirements that they have influenced the process without at least indicating generally who they're influencing. Are they influencing the doctor at the Mayo Clinic who is providing the CPAP machine? Is that who they're... Because that's the person who chooses the provider, right? Not necessarily. The doctor is the prescriber who chooses which service to prescribe. Who chooses the provider then? Medicare doesn't choose the provider.  Who chooses who they buy bandages from? What? Who chooses who they buy bandages or drugs from? They could buy them from any number of providers of DME or other medical products. It could be a doctor. It could be somebody else. But if you're saying that there are tons of people in that system who could choose a DME provider, then providing no details about how they influence that process is problematic for you, is it not? I don't think it's problematic at all. They can influence the process, and that's why Optogen paid them. My client was a CFT for 15 years. And did your client influence the process? He had the ability to. Did he influence the process? I don't know. He's the plaintiff. He's the relator. So why isn't he saying, I influenced the process when I was paid this amount of money by Optogen and LendCare above market rates? And as a result of getting that money, because it was really sweet, I used to go to the hospitals and tell them, Hey, when you have a CPAP you need to get, this is the DME provider to use. He certainly could have influenced it. I don't know what the circumstances were at this place. He's your client. If he had knowledge, he'd be in the complaint. He does have plenty of knowledge, and then his knowledge is reflected in the complaint. We've alleged that these people had the ability to influence the process, and they did influence the process. And that allegation is... Nobody knows what the process is. You've told me you don't know what the process is. The prescribing process has to be pleaded with greater specificity. I don't know. I'm asking you. How am I supposed to know whether or not you've satisfied Rule 9 when you don't even tell me what the process is? It could be the doctor. It could be somebody in the billing office. It could be somebody in medical supplies. It could be somebody at the pharmacy. It could be a PA. What is the process? We have alleged that these CFTs have the ability to influence this process, and that's why they're paid set-up fees. That's what we've alleged. I know. I'm just wondering if we don't know what the process is, how that can be enough. All right. Thank you both very much. You're welcome. We're in recess for today. I'm okay.